**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| JOHN LEROY JONES; ROSIE LEE MATHEWS and THE ESTATE OF ANTHONY JONES, | Case No. 2:12-cv-01636-APG-CWH |
| Plaintiffs, | **ORDER GRANTING SUMMARY JUDGMENT** |
| v. | (Dkt. #32) |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT; MARK HATTEN; TIMOTHY ENGLISH; RICHARD FONBUENA; STEVEN SKENADORE AND DOES 1-10, inclusive, | |
| Defendants. | |

   This §1983 case stems from the death of Anthony Jones in the early morning of December 11, 2010. The autopsy report listed "cocaine and ethanol intoxication" as the cause of death, with cardiomegaly (enlarged heart), high blood pressure, and police restraining procedures as "significant contributing" conditions. These restraining procedures—which included two officers using taser guns on Jones as he repeatedly resisted arrest after fleeing a traffic stop, one officer using his baton to try to wrestle Jones's arm out of a threatening position, and a fourth officer using his hands to grab Jones's ankles to stop Jones from kicking—prompted Jones's estate and parents to sue both the individual officers and the Las Vegas Metropolitan Police Department ("Metro").

   Plaintiffs allege, among other things, that the officers used excessive force when trying to restrain Jones and that Metro's policies regarding the procedures are unconstitutional. Having reviewed the defendants' Motion for Summary Judgment and related briefs, I find that plaintiffs cannot maintain their claims. Plaintiffs do not have standing to bring their first, second, and third claims for relief. They provide insufficient evidence to support their fourth claim for relief. And

1    Nevada's discretionary immunity statue bars their fifth, sixth, and seventh claims for relief.

2    Accordingly, I grant defendants' motion.

3                              **FACTUAL BACKGROUND**

4    **The Traffic Stop**

5          Shortly after 1:05 a.m. on Saturday, December 10, 2011, Metro Officer Mark Hatten

6    pulled over Anthony Jones for driving a vehicle without headlights and turning right on red

7    without coming to a complete stop. Officer Hatten remembers that when he asked Jones why he

8    was driving without headlights, Jones "looked straight ahead" and "didn't answer."[1]  When he

9    asked Jones more basic questions, intended to "make [Jones] feel at ease," Jones responded in a

10   way Officer Hatten described as "vague," "odd," and "nervous."[2]

11         Because he had already seen Jones try to conceal his left hand between the door panel and

12   his left thigh when Officer Hatten first approached Jones's vehicle, these answers caused Officer

13   Hatten to become "concerned that [Jones] was hiding something in the vehicle, maybe a

14   weapon."[3] So he asked Jones to step out from behind the wheel. Jones complied. Then he asked

15   Jones to place his hands behind his back, and told him, "I'm just going to pat you down for any

16   weapons."[4] To which Jones responded, "What's the problem, Officer?" and instead of putting his

17   hands behind his back, brought them up towards his waistband.[5]

18         Officer Hatten interpreted this movement as an effort to possibly reach for a concealed

19   weapon.[6] So he pulled out his firearm, created a distance of about 25 feet between himself and

20

21
     _____

22   [1] Dkt.# 32-3 at 43.

23   [2] *Id*. at 42.

24   [3] *Id*. at 43, 45.

25   [4] *Id*. at 48.

26   [5] *Id.*

27   [6] *Id*. at 49.

28

1   Jones and ordered Jones to "Show me your hands!" Using his police radio, he also issued a "Code
2   Red."[7]

3        Soon sirens could be heard, which, according to Officer Hatten, seemed to agitate Jones.[8]
4   Of even more concern to Officer Hatten, however, was that Jones started moving towards his own
5   car.[9] Not wanting Jones to re-enter it, Officer Hatten, still holding his firearm, attempted to grab
6   the back of Jones's jacket with his free hand.[10] But as soon as he did, Jones sprinted across Lake
7   Mead Blvd.[11]

8   **The Chase**

9        Jones was 6'0'' and weighed 236 pounds. Officer Hatten, in contrast, was 5'7'' and
10  weighed170 pounds. So after Officer Hatten informed dispatch that he was about to pursue Jones
11  on foot, he intentionally did not try to apprehend Jones on his own.  He knew their difference in
12  size and strength would make it difficult to arrest Jones without back-up.[12] Instead, his plan was
13  to follow close enough behind to simply keep a visual on Jones.[13]

14       But then Officer Hatten saw Jones lose his footing and tumble in the backyard of an
15  abandoned home on Hart Street.[14] Thinking he might have a tactical advantage now that Jones
16  was on the ground, Officer Hatten closed in and grabbed Jones with his left hand.[16] But Jones

17

18

---

19  [7] *Id*. at 51-52, 54. A "Code Red" communicates that an officer is in distress and needs assistance.

20  [8] *Id*. at 54.

21  [9] *Id.*

22  [10] *Id.*

23  [11] *Id.*

24  [12] *Id.*

25  [13] *Id*. at 60.

26  [14] *Id*. at 60, 63.

27  [16] *Id*. at 65.

28

1  resisted, even though Officer Hatten had, with his right hand, pressed his firearm against Jones's

2  back and warned that if Jones did not "get on the ground . . . I will shoot you."[17]

3  **Officer Hatten Tases Jones**

4       Freeing himself from Officer Hatten's control, Jones eventually stood up and turned to

5  face Officer Hatten, at which point Officer Hatten holstered his firearm and took out his taser

6  gun. "[G]et on the ground," he said, "or I'm going to tase you."[18] But instead of getting on the

7  ground, Jones advanced toward Officer Hatten; in response, Officer Hatten deployed his taser

8  against Jones in "dart-mode."[19]

9       Seemingly unfazed, Jones continued to advance.[20] So Officer Hatten deployed his taser

10  again, this time in the more powerful "drive-stun" mode.[21] Yet this too appeared to have no effect

11  on Jones, who was now only about a foot away from Officer Hatten.[22] Then, with a third tase,

12  Jones's body finally locked up, and Officer Hatten guided him to the ground.[23]

13       Jones kept resisting, however. In particular, he would not remove his hands from

14  underneath his body.[24] Officer Hatten responded by tasing Jones again and wrestled with him

15  until additional officers arrived.[25]

16

17

18

---

19  [17] *Id.* at 68.

20  [18] *Id.* at 69.

21  [19] *Id.* at 70.

22  [20] *Id.* at 70

23  [21] *Id.*

24  [22] *Id.*

25  [23] *Id.* at 70-71.

26  [24] *Id.* at 77, 79.

27  [25] *Id.*

28

1  **Officer Fonbuena Uses His Baton on Jones**

2       Officer Richard Fonbuena arrived and observed that Jones "was a real strong individual"

3  and was "resisting pretty good."[26] Seeing Jones lying on his stomach still fighting with Officer

4  Hatten, Officer Fonbuena ordered Jones to stop resisting and show the officers his hands.[27] When

5  that didn't work, he used his expandable baton to try to pull Jones's right arm out into a position

6  where it could be handcuffed, employing a technique called "stirring the pot."

7       So I deployed my expandable straight baton, straightened it out and put it on the crook of
   [Jones's] elbow and started with the—stirring the pot. You're stirring in the circular

8  motion to try to lever the arm out, and that worked for the [right] arm.[28]

9  But each time Officer Fonbuena pulled Jones's arm out, Jones would pull it back in.[29] Eventually,

10  however, he controlled Jones's right arm and, after an additional 30-60 seconds of struggling, he

11  managed to control Jones's left arm as well.

12       Before that, though, Officer Fonbuena had noticed that Jones kept his hands "in a balled

13

14  position."[30] This caused Officer Fonbuena to yell, "He's got something in his hands."[31] Hearing

15  this, Officer Hatten immediately tased Jones more times, later explaining that he believed Jones

16  "had a weapon because that was my fear from the beginning of the stop all the way up to [the

17  point Officer Fonbuena yelled what he did]."[32]

18  / / / /

19

20

_____

21  [26] Dkt.# 32-5 at 39, 46-47.

22  [27] Dkt.# 32-5 at 47.

23  [28] *Id.*

24  [29] *Id.* at 82.

25  [30] Dkt.# 32-3 at 84; Dkt.# 32-4 at 44.

26  [31] Dkt.# 32-4 at 44; Dkt.# 32-3 at 84.

27  [32] Dkt.# 32-3 at 84.

28

**Officer English Tases Jones**

Officer Hatten deployed his taser gun 10 times that night for a total of 92 seconds, although it is unclear how many of these deployments actually made contact with Jones.[33] Officer Timothy English arrived on the scene after Officer Fonbuena and also heard someone call out that Jones had something in his hand.[34]  English deployed his taser two times for a total of ten seconds.[35] First, he targeted Jones's back. Then, not getting the desired effect, he focused on Jones's left arm. He testified that he did this because "as soon as I heard [that Jones had something in his hand], I thought that he was going to pull up a firearm, and the first person in his way would have been me."[36]

**Officer Skenandore Grabs Jones's Ankles**

The final officer named in the suit is Officer Steven Skenadore. When he arrived, he noticed that Officer Hatten was near Jones's "bottom half," Officer Fonbuena was "kind of near the torso area," and Officer English was "near [Jones's] head."[37] So Officer Skenadore went to Jones's feet.

---

[33] Dkt.# 32-14.

[34] Officer Hatten testified that he heard Officer Fonbuena call out "He's got something in his hand." Dkt.# 32-3 at 84. Officer English, meanwhile, testified that the call came from Officer Hatten. Dkt.# 32-4 at 44. I do not find small inconsistencies like this enough to support plaintiffs' argument that gaps in the officers' testimony create issues of material fact, especially given how much of their testimony is consistent and how much is supported by, among other things, the autopsy report, the paramedics' log, and plaintiffs' own expert.

[35] Dkt.# 32-3 at 44.

[36] Dkt.# 32-4 at 46.

[37] Dkt.# 32-6 at 17-18.

Grabbing Jones's ankles, Officer English bent Jones's legs in a 90-degree angle and kept them in that position for approximately three to five seconds.[38] This technique is designed to restrict the person's leg movements. He stopped once Jones was handcuffed.

**Jones's Death**

Once Jones was handcuffed—which was around 1:15 a.m, about 10 minutes after the triggering traffic stop—the officers rolled him over onto his side to check for weapons.[39] Almost immediately, the officers noticed that Jones was unresponsive.[40] Officer Hatten tried talking to him, but Jones did not respond.[41]  Officer Fonbuena saw that Jones's eyes had rolled back into his head.[42] He also saw that Jones was not breathing.[43] He then attempted a "sternum rub," which is a technique used to wake people from unconsciousness by applying pressure with the knuckles to the sternum. Nothing happened.[44]

Two other officers not named in the suit began performing CPR and a third told dispatch to call the paramedics.[45] The call went out at 1:16 a.m., and the paramedics arrived at 1:25 a.m. According to their records, what they found was "Metro officers performing good and effective

---

[38] *Id.*

[39] Dkt.# 32-4 at 32; Dkt.# 32-6 at 21.

[40] Dkt.# 32-4 at 58; Dkt.# 32-5 at 58.

[41] Dkt.# 32-4 at 32.

[42] Dkt.# 32-5 at 60.

[43] *Id.*

[44] Dkt.# 32-6 at 23.

[45] Dkt.# 32-5 at 61.

1  CPR" and a subject (Jones) who was "supine on the ground, unresponsive, apneic, and

2  pulseless."[46]

3      Jones was taken to the Valley Hospital emergency room. On the way, he was given a bag-

4  valve mask for respiratory resuscitation. When he arrived, he was intubated. Neither proved

5  successful.  He was pronounced dead at 1:59 a.m.[47]

6  **The Autopsy Report**

7      The next day Lisa Gavan, the Clark County Coroner, performed Jones's autopsy. Tin foil

8  with cocaine residue was found between Jones's buttocks and his toxicology report revealed

9  cocaine at "toxic/lethal" levels. A blood alcohol level concentration of .04% was measured (the

10  legal limit is .08%) and the drug Atropine was discovered. Dr. Gavan also noted that Jones "was

11  an obese man with enlarged heart and mild hypertensive changes of his kidneys." She concluded

12  that he "died of cocaine and ethanol intoxication" and listed the following as "other significant

13  contributing" conditions: "cardiomegaly due to obesity and mild hypertension and police

14  restraining procedures."[48]

15  **PROCEDURAL BACKGROUND**

16      Plaintiffs filed their complaint on September 18, 2012.[49] They amended it on April 10,

17  2013.[50]  The amended complaint alleges that: (1) Jones was unlawfully detained  in violation of

18  his Fourth Amendment Rights; (2) the police officers used excessive force on Jones and denied

19  him medical care in violation of his Fourth Amendment Rights; (3) Jones's parents were deprived

20  of the their Fourteenth Amendment due process right to be free from unwarranted interference

21  with their familial relationship with Jones; (4) the alleged unconstitutional acts of the police

22  _____

23  [46] Dkt.# 32-13 at 3.

24  [47] *Id.*

25  [48] Dkt.#32-13.

26  [49] Dkt.#1.

27  [50] Dkt.#20.

28

officers occurred because of unconstitutional policies, customs, and practices of Metro—in other words, a *Monell* claim; and (5) there were three state law violations: false imprisonment, battery, and negligence.[51]

Defendants filed for summary judgment on November 8, 2013.[52] In their Opposition, plaintiffs abandoned their claims against Officers Richard Fonbuena and Steven Skenandore, as well as their claim for denial of medical care.[53]

## DISCUSSION

### Legal Standard

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[54]  Material facts are those that may affect the outcome of the case.[55]  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.[56]  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor."[57]  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims."[58]

---

[51] *Id.*

[52] Dkt. #32.

[53] Dkt. 37 at 1.

[54] Fed. R. Civ. P. 56(a).

[55] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[56] *See id.*

[57] *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).

[58] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, courts apply a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."[59]  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.[60]  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.[61]

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists.[62]  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[63]  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data.[64]  Instead, the opposition must go beyond the assertions and allegations of the

---

[59] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

[60] *See Celotex*, 477 U.S. at 323–24.

[61] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

[62] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[63] *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

[64] *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

10

1  pleadings and set forth specific facts by producing competent evidence that shows a genuine issue

2  for trial.[65]

3  At summary judgment, a court's function is not to weigh the evidence and determine the truth but

4  to determine whether there is a genuine issue for trial.[66]  The evidence of the nonmovant is "to be

5  believed, and all justifiable inferences are to be drawn in his favor."[67]  But if the evidence of the

6  nonmoving party is merely colorable or is not significantly probative, summary judgment may be

7  granted.[68]

8  **First and Second Claims for Relief: Fourth Amendment**

9        The first two claims of the amended complaint allege that the defendant officers, pursuant

10  to 42 U.S.C. § 1983, violated Jones's Fourth Amendment rights. Plaintiffs argue that the initial

11  traffic stop by Officer Hatten was an unconstitutional search and seizure and that after this stop,

12  the officers used excessive force while trying to apprehend Jones.

13        None of the plaintiffs has standing to bring these claims.  Nevada state law provides for

14  the survival of a cause of action for injuries suffered by an individual who dies before judgment is

15  rendered.[69] But this right extends only to the official representatives of an individual's estate;

16  family members and heirs are not included, in the sense that they cannot bring a claim just

17  because they are family members or heirs.[70] To pursue a survival cause of action the plaintiff

18  must be a "duly appointed representative[] of the deceased's estate."[71]

19

20

21  [65] *See Celotex*, 477 U.S. at 324.

22  [66] *See Anderson*, 477 U.S. at 249.

23  [67] *Id.* at 255.

24  [68] *See id.* at 249–50.

25  [69] Nev. Rev. Stat. § 41.100(3).

26  [70] *Moreland v. Las Vegas Metropolitan Police Dep't.* 159. F.3d 365, 369 (9th Cir. 1998).

27  [71] *Id. at* 370.

28

11

At the time plaintiffs filed their original complaint, and at the time they filed their amended complaint, none of them was a duly appointed representative of Jones's estate. Nor did they cure this defect by the time defendants filed their motion for summary judgment. In fact, plaintiffs did not even initiate the appointment process until ten days after receiving defendants' motion for summary judgment,[72] even though plaintiffs claimed, in their amended complaint, that one of them (John's father) had already filled out the necessary paperwork to be appointed.[73]

Under Fed.R.Civ.P. 17(a), an "estate"—which is what plaintiffs list in the caption of all their moving papers—cannot be a plaintiff in a lawsuit.[74] A party to a lawsuit must be an actual or natural person; "the estate" is neither. Rule 17(a)(3) requires courts to provide an opportunity to substitute in the correct party before dismissing the claim, provided that the substitution is made within a reasonable time after objection.[75] But the Advisory Committee's comments make clear that although the rule was added in the interest of justice, "[t]he provision should not be misunderstood or distorted. It is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made."[76] Accordingly, "most courts have interpreted . . . Rule 17(a) as being applicable only when the plaintiff brought the action [in the name of the wrong party] as a result of an understandable mistake, because the determination of the correct party to bring the action is difficult."[77]

Here, determining the proper party was not difficult. The Nevada survival statute when read together with Rule 17(a) is clear: the proper party in a survival action is the duly appointed administrator of the estate. That party is not present in this case. And the "mistake" of not

---

[72] Dkt.# 37-2.

[73] Dkt.# 20 at ¶5.

[74] See *Estate of Manook v. Research Triangle Institute*, 693 F.Supp.2d 4 (D.D.C. 2010).

[75] See *Besig v. Dolphin Boating & Swimming Club*, 683 F.2d 1271, 1278 (9th Cir 1982).

[76] Fed. R. Civ. P. 17, Advisory Comm. Notes, 1966 Amend.

[77] *Weiburg v. GTE Southwest Inc.*, 272 F.3d 302 (5th Cir. 2001).

1    following the appropriate procedures seems a lot less "understandable" given the disconnect

2    between what the plaintiffs represented in their amended complaint in April of 2013—that John's

3    father had "filed the necessary documents with the Clark County Probate Court to be appointed as

4    the special administrator of THE ESTATE OF ANTHONY JONES"—and what their own

5    exhibits show: that this process was not even initiated until over six months later. Moreover,

6    plaintiffs have never requested leave to amend to cure this defect; instead they act as if no defect

7    exists.  With these procedural impediments in mind, I grant defendants' summary judgment

8    motion as to plaintiffs' first two claims for relief.

9    **Third Claim for Relief: Fourteenth Amendment**

10        Plaintiffs' third claim for relief, which is brought by Jones's parents, alleges that

11   defendants violated their Fourteenth Amendment due process rights "to be free from unwarranted

12   state interference with [their] familial relationship with [Jones]."[78]

13        Nearly every circuit that has addressed whether parents have a protected liberty interest in

14   their relationship with an adult child—Jones was 44 years old when he died—has concluded they

15   do not.[79] One of the only holdouts is the Tenth Circuit, which, in a case decided well before the

16   recent consensus had been reached, relied on a Seventh Circuit decision that the Seventh Circuit

17   recently overruled.[80] In addition, both the First Circuit and the Sixth Circuit have held that parents

18   do not have a protected liberty interested in their relationship with any children, adult or not.[81]

19

20

21   _____

     [78] Dkt. #20 at ¶ 46.

22
     [79] *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005); *McCurdy v. Dodd,* 352 F.3d 820 (3d. Cir. 2003); *Butera v.*
23   *District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001); *Shaw v. Stroud*, 13 F.3d 791 (4th Cir.) cert. denied,
     513 U.S. 813) (1994); *Valdiveso Ortiz v. Burgos*, 807 F.2d 6 (1st Cir. 1986).

24
     [80] See *Truillio v. Board of County Com'rs of Santa Fe County*, 768 F.2d 1186, 1187 (10th Cir. 1985) (citing
25   *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984)); *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005)
     (overruling *Bell v. City of Milwaukee*).

26
     [81] *Soto v. Flores*, 103 F.3d 1056, 1062 (1st Cir. 1997); *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir.
27   2000).

28

1    Without a cognizable constitutional right, plaintiffs cannot bring their Fourteenth

2    Amendment claim pursuant to 42 U.S.C § 1983, because to bring a claim under that statute a

3    plaintiff must allege both that the harmful conduct was committed under the color of state law

4    and that the conduct violated a constitutional right.[82]

5    Even if plaintiffs could bring this claim, however, they did not provide sufficient facts to

6    create a triable issue. The standard for this kind of Fourteenth Amendment claim is difficult to

7    meet. Only official conduct that "shocks the conscience"[83] qualifies—conduct, in other words, in

8    which an officer acted with a "purpose to cause harm unrelated to the legitimate object of

9    arrest."[84]  In fact, an officer's conduct may be objectively unreasonable "yet still not infringe the

10   more demanding standard that governs substantive due process claims."[85]

11   Here, the facts do not reveal conduct that a reasonable jury could find "shocks the

12   conscience." Had Officer Hatten wanted to act with a "purpose to cause harm," he probably

13   would not have holstered his firearm and switched to the less harmful alternative of a taser gun

14   when Jones confronted him. He would have instead shot Jones.  Nor is their evidence that any of

15   the police officers acted in a way "unrelated to the legitimate object of arrest." The evidence

16   shows that everything they did to Jones was to apprehend him. Once the officers finally

17   handcuffed him, they stopped using physical force and directed their attention to giving Jones

18   medical care.  For these reasons, I grant defendants' motion as to plaintiffs' third claim for relief.

19   / / / /

20   / / / /

21

22   [82] *Leer v. Murphy*, 844 F.2d 628, 632 (9th Cir. 1988) ("Section 1983 imposes two essential proof

23   requirements upon a claimant: (1) that a person acting under color of state law committed the conduct at
     issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the

24   Constitution or laws of the United States.")

25   [83] *County of Sacramento v. Lewis*, 118 S.Ct. 1708, 1711-1712 (1998).

26   [84] *Id.* at 834.

27   [85] *Moreland*, 159 F.3d at 371 n.4.

28
                                              14

**Fourth Claim for Relief: *Monell***

Plaintiffs also allege a *Monell* claim against Metro. They contend that Metro employed various unconstitutional polices that (1) inadequately supervised, trained, controlled, assigned, and disciplined each of the officers named in the lawsuit, all of whom have, according to plaintiffs, "dangerous propensities for using excessive force"; (2) failed to provide appropriate instructions about the use of force, including restraint techniques and taser guns; and (3) condoned the use of excessive force.[86]

Plaintiffs provide insufficient evidence to support these allegations. They do not attempt to substantiate, with performance reports or psychological assessments, their claim that the police officers had "dangerous propensities for using excessive force." They make no effort to establish a causal connection between the police officers' conduct and Metro's policies, beyond arguing— or rather assuming—that because the police officers acted the way they did, they must not have been adequately trained.  Mostly, plaintiffs focus on the behavior of the police officers on the night Jones died, a "single incident" approach the Supreme Court has found unpersuasive.[87]

More fundamentally, however, a prerequisite of a *Monell* claim is that their first be a violation of constitutional rights caused by the municipality's unconstitutional policies.[88] Because I do not find that there was any violation of constitutional rights in this case, I cannot find that there is a *Monell* claim. Therefore, I grant defendants' motion as to plaintiffs' fourth claim for relief.

/ / / /

/ / / /

---

[86] Dkt. # 20 at ¶55.

[87] "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to the municipal policy maker." *Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (1985) (holding that it was reversible error to allow the jury to infer the city had a thoroughly nebulous "policy" of "inadequate training" based on a single shooting incident).

[88] *City of Los Angeles v. Heller*, 475 U.S. 796 (1986)

**Fifth, Sixth, and Seventh Claims for Relief: State Law Claims**

In addition to their federal claims, plaintiffs assert three state law claims: false imprisonment/false arrest, battery, and negligence. Each of these can be addressed, collectively, by examining Nevada's discretionary immunity statute.

*Discretionary Immunity*

Under Nev. Rev. Stat § 41.032(1), no action may be brought against an officer or employer of Nevada "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." The key phrase here is "discretionary function," which the Nevada Supreme Court has linked to acts that require "personal deliberation, decision, and judgment" rather than mere "obedience to orders, or the performance of a duty in which the officer is left no choice of his own."[90] More specifically, the Ninth Circuit has made clear that, in the context of police work, "discretionary function" applies to "an officer's decision as to how to accomplish a particular seizure or search . . . and officers are therefore immune from suit as to state law claims arising therefrom in most cases."[91]

All of the actions taken by the police officers in the present case involved "personal deliberation, decision, and judgment." All of the actions involved an "element of judgment or choice."[92] Officer Hatten could have chosen not to chase Jones, nor try to apprehend him when Jones tripped and fell. He could have chosen not to tase Jones when he advanced, nor continue to tase him when Jones resisted. He could have chosen to not to pull Jones over in the first place. The same is true of the other police officers and their actions. They all made decisions, often in

---

[90] *Maturi v. Las Vegas Metropolitan Police Dept.* 110 Nev 307, 309 (1994) (citations omitted).

[91] *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007).

[92] *Martinez v. Marusczak*, 123 Nev. 433, 446-447 (2007) (setting out the elements needed for discretionary immunity)

split-second moments, that involved an element of choice. They all made decisions therefore that entitle them to discretionary immunity.

### Bad Faith

Plaintiffs contend, however, that these decisions were made in "bad faith." If true, that would disqualify the officers from the protections of discretionary immunity.[93] Specifically, plaintiffs cite *Davis v. City of Las Vegas* as a parallel case.

But even viewing the facts of this case in a light most favorable to the plaintiffs, I do not find that the actions of the police officers here parallel the actions of the police officer in *Davis*. There, the officer responded to a call from a casino complaining that a man was reading a magazine atop a stairwell not open to the public. When the officer arrived, he found that casino security had already put the man in handcuffs. The officer did not remove the handcuffs. Instead he patted the man down and then asked if he would consent to a search. The man said no, as was his right. The officer then tried to conduct a search anyway, reaching inside the man's left pocket to retrieve the man's wallet. When the man swiveled his hips to prevent the unconsented-to-search, the officer slammed the man, headfirst, into a wall. He then slammed the man, again headfirst, into another wall. One of these head-first slams left a sizable dent in the wall.[94]

At various points, the officer also threw the man to ground in such a way that the man's teeth hit the floor; jumped on top of the man, placing his knee on the man's back; and, turning him over, punched him the face. As a result, the man ended up with a fractured neck. The officer did not take him to the hospital until after he was booked into jail, despite the man's complaints that he was in severe pain.[95] That is "bad faith." The officer arrested a citizen "in an abusive manner not as the result of the exercise of poor judgment as to the force required to make an

---

[93] Davis, 478 F.3d at 1059 ("[W]here an officer's actions are 'attributable to bad faith, immunity does not apply whether an act is discretionary or not.'") (quoting *Falline v. GNLV Corp.*, 107 Nev. 1004, 1009 (1991)).

[94] *Id.* at 1051-1052.

[95] *Id.*

1   arrest, but instead . . . because of a willful or deliberate disregard for the rights of a particular

2   citizen or citizen."[96] But this is not, importantly, what happened in the present case.

3        Here there is no evidence of a "willful or deliberate disregard" for the rights of Jones,

4   who, unlike the man in *Davis*, unlawfully—and repeatedly—resisted arrest and was thought to

5   have a weapon. Nor is there any evidence that the police officers acted out of personal animus, as

6   occurred in *Pike v. Hester*,[97] another Nevada case in which the "bad faith" standard was met.

7   Here we have only the sad combination of circumstances—toxic levels of cocaine, physical

8   resistance, and taser guns—that led to the premature death of LeRoy Jones. The defendants are

9   entitled to discretionary immunity, so I grant their motion as to the fifth, sixth, and seven claims

10  for relief.

### CONCLUSION

11
12  **IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment

13  **(Doc. #32)** is **GRANTED**. The clerk shall enter judgment in favor of Defendants and against

14  Plaintiffs and close the case.

15

16

17      Dated: November 6th, 2014.

18                                              _____
                                                ANDREW P. GORDON
19                                              UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25   _____

26   [96] *Id.* at 1060.

27   [97] *Pike v. Hester*, WL 1792394 (D. Nev. 2013).

28
                                    18